UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EUGENE C. BROWN, | Case No. 1:19-cv-00352-DAD-EPG (PC) |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED IN PART AND DENIED IN PART |
| C. CHOTHIA, et al., | |
| Defendants. | (ECF No. 70) |

## I. INTRODUCTION

Plaintiff Eugene C. Brown ("Plaintiff") is a state inmate proceeding *pro se* and *in forma pauperis* in this civil rights action filed pursuant to 42 U.S.C. § 1983.

This case proceeds on Plaintiff's complaint alleging claims against Defendants C. Chothia, A. Shaw, L. Kempe, C. Jukes, M. Gilmore, J. Walker, M. Crutchfield, K.A. Allen, D. Artis, and C. Patillo[1] for deliberate indifference to serious risk of harm in violation of the Eighth Amendment and against Defendants C. Jukes, M. Londono, and M. Crutchfield for retaliation in violation of the First Amendment. (ECF No. 20.)

On February 5, 2021, Defendants Chothia, Shaw, Kempe, Jukes, Gilmore, Walker, Crutchfield, Allen, Artis, and Londono ("Defendants") filed a motion for summary judgment on

---

[1] Defendant Patillo was dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) on December 9, 2020. (ECF No. 67.)

Plaintiff's claims for violation of his First and Eighth Amendment rights. (ECF No. 70.) Plaintiff filed an opposition on March 22, 2021. (ECF No. 76.) Defendants filed a reply on April 20, 2021. (ECF No. 80.)

For the reasons that follow, the Court will recommend that Defendants' motion for summary judgment be granted in part and denied in part.

## II.     BACKGROUND

Plaintiff is an inmate at the Sierra Conservation Center ("SCC") in Jamestown, California. Plaintiff's complaint alleges that he was blasted in the face with fumes during a forklift propane tank exchange while working in the SCC Sewing Factory on August 8, 2018. (ECF No. 1 at 4.) Plaintiff was also exposed to fumes during forklift propane tank exchanges on September 6, 2018, October 26, 2018, and December 12, 2018. (*Id.* at 9-10.) During each of these events, the contents of the propane tanks were released into the workshop, filling it with toxic fumes and creating a danger of fire and/or explosion. (*Id.* at 4, 9-10.)

Plaintiff alleges that Defendants Chothia, Shaw, and Kempe were present during the August 8, 2018 incident and failed to take any action to address the risk. (ECF No. 1 at 4-5.) Defendants Jukes and Shaw ordered or directed the propane tank contents to be purposely released in to the workshop on September 6, 2018, after Plaintiff gave Defendant Jukes a copy of his medical lay-in following the first incident and verbally informed Defendant Jukes that Plaintiff had filed a 602 grievance regarding the unsafe conditions in the workshop. (*Id.* at 5-6, 9.) Plaintiff wrote to Defendant Gilmore, the Fire Captain at SCC, and Defendant Walker, the California Prison Industry Authority ("CALPIA") Health & Safety Officer, regarding the ongoing shop safety and health hazards but both failed to investigate or take any action to remedy the ongoing health and safety issue. (*Id.* at 9.) Plaintiff also filed a 602 grievance regarding the ongoing shop safety and health hazards. (*Id.* at 5.) Defendants Crutchfield, Allen, and Artis were all made aware of the unsafe conditions in the workshop through the grievance review and appeal process but failed to take any action to remedy them. (*Id.* at 5-8.)

Plaintiff also alleges that Defendant Jukes wrote a rules violation report ("RVR") against Plaintiff in retaliation for submitting the 602 grievance. (ECF No. 1 at 15.) Defendant Londono was the reviewing supervisor for the RVR and allowed it to be written in retaliation for Plaintiff

filing his 602 grievance. (*Id.* at 17-18.) Defendant Crutchfield retaliated against Plaintiff for filing a 602 grievance by yelling at Plaintiff, intimidating him, and repeatedly threatening him that she would fire him and transfer him to work somewhere else. (*Id.* at 16.)

On June 26, 2019, the Court entered a screening order finding that Plaintiff's complaint stated cognizable claims under the Eighth Amendment for deliberate indifference to serious risk of harm against Defendants Chothia, Shaw, Kempe, Jukes, Gilmore, Walker, Crutchfield, Allen, and Artis, and for retaliation in violation of the First Amendment against Defendants Jukes, Londono, and Crutchfield. (ECF No. 10.) The Court found that Plaintiff failed to state any other cognizable claims. (*Id.*) On July 8, 2019, Plaintiff notified the Court that he was willing to proceed only on the claims found cognizable by the screening order. (ECF No. 11.) On July 12, 2019, the Court entered findings and recommendations recommending that this action proceed on the First and Eighth Amendment claims found cognizable in the screening order. (ECF No. 15.) On September 9, 2019, the district judge assigned to the case entered an order adopting the Court's findings and recommendations in full. (ECF No. 20.)

### III.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

#### a.  Defendants' Motion

Defendants Shaw, Crutchfield, Walker, Allen, Kempe, Chothia, Artis, Jukes, and Gilmore argue that they are entitled to summary judgment on Plaintiff's Eighth Amendment claims against them because Plaintiff cannot show that these Defendants were objectively or subjectively deliberately indifferent to a serious risk of harm. (ECF No. 70-2 at 22-26.) The undisputed facts show that the forklift fuel tank procedures at the SCC Sewing Factory did not present a substantial risk of serious harm and Plaintiff's reported injury was unrelated to the alleged toxic exposure on August 8, 2018. (*Id.* at 23-24.) Defendants also did not have subjective knowledge of any excessive risk to Plaintiff's health or safety and did not disregard any such risk. (*Id.* at 24-26.)

Defendants Crutchfield, Jukes, and Londono argue that they are entitled to summary judgment on Plaintiff's First Amendment claims against them. (ECF No. 70-2 at 27-28.) Defendant Jukes did not write an RVR against Plaintiff and instead wrote a non-disciplinary counseling chrono. (*Id.* at 27.) Additionally, Defendant Crutchfield did not take any adverse action against Plaintiff because of his grievance. (*Id.* at 27-28.)

Finally, Defendants argue that they are entitled to qualified immunity on Plaintiff's claims because the law was not clearly established that an employee could be held liable under these circumstances. (ECF No. 70-2 at 28-29.)

b. Plaintiff's Opposition

In his opposition, Plaintiff argues that Defendants Shaw, Crutchfield, Walker, Allen, Kempe, Chothia, Artis, Jukes, and Gilmore are not entitled to summary judgment on Plaintiff's Eighth Amendment claims. (ECF No. 76 at 1-27.) The mixture of propane and ethyl mercaptan inside the propane tanks used on the forklifts in the SCC Sewing Factory is very toxic and extremely flammable. (ECF No. 76 at 25-27.) Defendants were aware of the danger because they are responsible for the SCC Sewing Factory's safety and had knowledge, training, and experience regarding hazardous chemicals. (*Id.* at 10-13, 22.) Defendants were also made aware of the danger when Plaintiff notified them that he was injured during the August 8, 2018 incident. (*Id.* at 23.)

Additionally, Defendants Crutchfield, Jukes, and Londono are not entitled to summary judgment on Plaintiff's First Amendment claims. (ECF No. 76 at 1-27.) Defendant Jukes only wrote the RVR against Plaintiff after learning about Plaintiff's 602 grievance. (*Id.* at 20.) Additionally, Plaintiff was entitled to be verbally counseled first and Defendant Jukes and Londono skipped steps and went straight to issuing an RVR. (*Id.* at 17-18.) Plaintiff also claims that Defendant Crutchfield intimidated and threatened to fire him during the 602 appeal interview. (*Id.* at 76.)

Finally, Plaintiff argues that Defendants are not entitled to qualified immunity because his constitutional rights were clearly established at the time of the alleged violations. (ECF No. 76 at 21-22.)

c. Defendants' Reply

On reply, Defendants argue that Plaintiff has not submitted any admissible evidence showing that the propane tank exchange procedure created a substantial risk of serious harm under the conditions at the SCC Sewing Factory. (ECF No. 80 at 2-4.) Plaintiff also has not submitted any admissible evidence demonstrating that Defendants Shaw, Crutchfield, Walker, Allen, Kempe, Chothia, Artis, Jukes, and Gilmore actually knew of and disregarded an excessive

4

risk to Plaintiff's health or safety. (*Id.* at 4-6.) Likewise, Plaintiff does not raise a material dispute of fact as to the retaliation claims against Defendants Jukes, Londono, and Crutchfield. (*Id.* at 6-9.) Finally, Defendants are entitled to qualified immunity. (*Id.* at 9.)

## IV.    SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*) ("If there is a genuine dispute about material facts, summary judgment will not be granted.").  A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The Court may consider other materials in the record not cited to by the parties, but is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party moves for summary judgment on the basis that a material fact lacks any proof, the Court must determine whether a fair-minded jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff.").  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322.  Additionally, "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party."  *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011).  It need only draw inferences, however, where there is "evidence in the record … from which a reasonable inference . . .  may be drawn"; the court need not entertain inferences that are unsupported by fact.  *Celotex*, 477 U.S. at 330 n. 2 (citation omitted).  Additionally, "[t]he evidence of the non-movant is to be believed . . .."  *Anderson*, 477 U.S. at 255.

## V.     DISCUSSION[2]

### a.   Eighth Amendment Deliberate Indifference Claims

#### i.  Legal Standards

"The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). Prison officials have a duty "to take reasonable measures to guarantee the safety of inmates, which has been interpreted to include a duty to protect prisoners."  *Labatad v. Corrections Corp. of America*, 714 F.3d 1155, 1160 (9th Cir. 2013) (citing *Farmer*, 511 U.S. at 832–33; *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005)). To establish a violation of this duty, the prisoner must "show that the officials acted with deliberate indifference to threat of serious harm or injury to an inmate."  *Labatad*, 714 F.3d at 1160. This involves both objective and subjective components. The objective component requires that the alleged deprivation be "sufficiently serious"; where a

---

[2] The parties have each objected to the opposing party's evidence on various grounds. (*See* ECF Nos. 76 at 168-95, 80-4, 80-5.) To the extent the Court necessarily relied on evidence that has been objected to, the Court relied only on evidence it considered to be admissible. Generally, it is not the practice of the Court to rule on evidentiary matters individually in the context of summary judgment. "This is especially true when, as here, 'many of the objections are boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence.'"  *Capital Records, LLC v. BlueBeat, Inc.*, 765 F.Supp.2d 1198, 1200 n.1 (C.D. Cal. 2010) (quoting *Doe v. Starbucks, Inc.*, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009))).

failure to prevent harm is alleged, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). The subjective component requires that the prison official actually "know of and disregard an excessive risk to inmate health or safety." *Id.* at 837; *Anderson v. County of Kern*, 45 F.3d 1310, 1313 (9th Cir. 1995).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health . . .." *Farmer*, 511 U.S. at 843. "[D]eliberate indifference entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." *Id.* at 835. This "deliberate indifference" standard is equivalent to recklessness, in which a person disregards a risk of harm of which he is aware. *Id.* at 836–37.

### ii. Objective Deliberate Indifference

Defendants Shaw, Crutchfield, Walker, Allen, Kempe, Chothia, Artis, Jukes, and Gilmore move for summary judgment on Plaintiff's Eighth Amendment deliberate indifference claims. (ECF No. 70-2 at 22-24.)

It is undisputed that the SCC Sewing Factory is a large building with high ceilings and fourteen industrial oscillating fans, six swamp coolers, seven exhaust fans, and a large roller door next to where forklift tanks are exchanged. (Undisputed Material Fact ("UMF") 1, ECF Nos. 70-3 at 1-2, 76 at 168-69.) The SCC Sewing Factory also contains several ovens, heating elements, and ironing stations, overhead power strips with sewing machines plugged in, and a mechanic's cage where welding, grinding, and filing are performed. (ECF Nos. 76 at 168-69, 80-5 at 2.) The SCC Sewing Factory forklift is powered by liquid propane gas and the tank is removed and stored in a secure location inaccessible to inmates when the forklift is not in use.[3] (UMF 3-4, ECF Nos. 70-3 at 2, 76 at 169.)

---

[3] Plaintiff disputes whether this procedure is necessary, as he contends that the tank was not removed between 2013 and 2016, but does not appear to dispute that this procedure was followed at the time of the incidents at issue in Plaintiff's complaint. (*See* ECF No. 76 at 169.)

On August 8, 2018, Defendant Chothia was training a new and inexperienced mechanic, inmate Davis, at the SCC Sewing Factory. (UMF 13, ECF Nos. 70-3 at 3, 76 at 170.) The hose connecting the fuel tank to the forklift was not threaded correctly, and fumes[4] were released from the tank for approximately ten seconds. (UMF 15, ECF Nos. 70-3 at 3, 76 at 170.) Plaintiff was sprayed in the face with the fumes and inhaled and swallowed them. (Verified Complaint, ECF No. 1 at 4.) Fumes were also released in to the SCC Sewing Factory during the forklift propane exchange process on September 6, 2018, October 26, 2018, and December 12, 2018. (*Id.* at 9-10.)

Defendants Shaw, Crutchfield, Walker, Allen, Kempe, Chothia, Artis, Jukes, and Gilmore argue that they are entitled to summary judgment on Plaintiff's Eighth Amendment claims because Plaintiff cannot meet the objective component necessary to establish deliberate indifference. (ECF No. 70-2 at 22-24.) According to Defendants, a ten second release of fumes during the forklift fuel exchange process at the SCC Sewing Factory does not present a substantial risk of serious harm from toxic exposure, fire, or explosion. (*Id.*) Plaintiff, in turn, argues that the fumes from the propane tanks that were released in to the SCC Sewing Factory are toxic and flammable and therefore create a substantial risk of serious harm. (ECF No. 76 at 195.)

### 1. The Parties' Expert Opinions

In support of their motion, Defendants submit declarations from Timur S. Durrani, M.D., M.P.H., Steven I. Sasson, and Defendant Gilmore providing opinions regarding the risk of harm from a release of propane tank fumes at the SCC Sewing Factory. (Durrani Decl., ECF No. 70-4 at 242-69; Sasson Decl., ECF No. 70-4 at 270-77; Gilmore Decl., ECF No. 70-4 at 210-41.) Plaintiff objects to these opinions on various grounds and submits his own declaration opining that the propane tank fumes released in the SCC Sewing Factory were toxic and flammable.

---

[4] It is undisputed that propane is odorless and an additive, ethyl mercaptan, is included to give it a smell so that its presence can be detected. (UMF 9, ECF Nos. 70-3 at 2, 76 at 169.) Defendants contend that, on August 8, 2018, the fumes that Plaintiff was exposed to were from the odorant and that no propane actually leaked from the tank, while Plaintiff argues that "propane/ethyl [mercaptan] forms a chemical compound mixture . . . at the atomic level—thus inseparable. The presence of one is an alert to the presence of the other." (UMF 16, ECF Nos. 70-3 at 3, 76 at 170.) On reply, Defendants submitted a supplemental declaration from Timur S. Durrani, M.D., M.P.H. stating that there is "no evidence of chemical reaction when propane and ethyl mercaptan are mixed to create a covalent bond. Although the two substances are mixed, they do not share a chemical bond." (Durrani Suppl. Decl., ECF No. 80-1 at 3.) Defendants also submitted a supplemental declaration from Steven I. Sasson opining that ethyl mercaptan does not react with propane and the two remain separate gases. (Sasson Suppl. Decl., ECF No. 80-3 at 2.) Although the parties dispute whether the fumes were a mixture of propane and ethyl mercaptan or solely ethyl mercaptan, this dispute is immaterial. As discussed below, Defendants have produced evidence that the SCC Sewing Factory did not create a substantial risk of serious harm even if the fumes contained both propane and ethyl mercaptan.

(Brown Decl., ECF No. 76 at 135-60; *see also* ECF No. 76 at 175-77, 186-90.)

Dr. Durrani's Declaration

Dr. Durrani provides an expert opinion on the toxicology of propane and ethyl mercaptan, including the health effects of exposure, and whether the injury Plaintiff described is consistent with the health effects of exposure to propane and ethyl mercaptan. (Durrani Decl., ECF No. 70-4 at 265.) Dr. Durrani's declaration and curriculum vitae describe his experience and education in the areas of medicine and medical toxicology. (*Id.* at 242-65.)

Dr. Durrani explains that propane is odorless and colorless, "[i]ts primary hazard is its ability to ignite[,]" and it is a simple asphyxiant, meaning it can displace oxygen. (*Id.* at 266.) According to Dr. Durrani, "[t]he toxicity of propane is low[.]" (*Id.*) He describes data available on controlled propane exposure as well as the Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, and Occupational Health and Safety Administration guidelines for propane exposure. (*Id.* at 266-67.)

Ethyl mercaptan, in turn, is added to propane as a warning indicator because propane is colorless and odorless. (Durrani Decl., ECF No. 70-4 at 267.) Ethyl mercaptan has a strong odor at low concentrations and a high vapor pressure, making it an effective warning indicator for propane. (*Id.*) Dr. Durrani describes a case report where 30 high school students were accidentally exposed to an estimated 4ppm for approximately 1 hour, resulting in reversible dull headache, general discomfort, abdominal pain, vomiting, and diarrhea. (*Id.*) The amount of ethyl mercaptan in propane is 0.5 ppm, lower than the 4 ppm the students were exposed to. (*Id.*)

Based on the information provided to Dr. Durrani, the propane tanks used on the SCC Sewing Factory forklifts hold eight gallons of liquid propane. (Durrani Decl., ECF No. 70-4 at 268.) The SCC Sewing Factory is approximately 307,125 cubic feet, with fourteen industrial oscillating ceiling fans, six swamp coolers, seven exhaust fans, and a large roller door. (*Id.*) According to Dr. Durrani, "[u]sing these parameters, with reasonable medical probability, the removal and replacement of the propane tank should not present a significant risk of toxic exposure." (*Id.*) Additionally:

> even if the entire 8 gallon tank were allowed to empty in that space, and the space was completely sealed, the propane levels would not exceed the National Institute of Occupational Safety and Health (NIOSH) level that is immediately dangerous to

> life or health (DLH) or the OSHA PEL. A ten second leak of LPG, would be less
> and disbursed by the building's ventilation system, eliminating the possibility of
> oxygen displacement or any toxicity from propane gas or ethyl mercaptan.

(*Id.*) Further, in Dr. Durrani's opinion, with reasonable medical probability, the symptoms

Plaintiff described following the August 8, 2018 incident were not caused by his limited exposure

to propane and ethyl mercaptan. (*Id.*)

Mr. Sasson's Declaration

Steven I. Sasson provides an expert opinion on the risk of fire or explosion from the

forklift fuel tank exchange process at the SCC Sewing Factory. (Sasson Decl., ECF No. 70-4 at

271-77.) Mr. Sasson is an Associate Industrial Hygienist for CALPIA and is responsible for

assessing compliance with Title 8 Section 3202, which requires employers to provide a safe and

healthy workplace for all employees. (*Id.* at 271.) Mr. Sasson has thirty-five years of experience

in the area of workplace health and safety and has worked for various state and local entities,

including as an Associate Industrial Hygienist at the Childhood Lead Poisoning Prevention

Branch and as a Hazardous Materials Specialist for the California Health Care Facility at CDCR.

(*Id.*)

Mr. Sasson conducted a site visit and survey at SCC on November 2, 2020, using an LEL

meter, which detects if there is enough gas in the atmosphere to initiate combustion or explosion.

(Sasson Decl., ECF No. 70-4 at 276.) During the site visit, the forklift was started and the LEL

meter was placed beneath the tank as close to the valve as possible in order to increase the

probability that the heavier than air gas would be detected by the meter. (*Id.*) Oxygen was at 20.8

percent and propane was at 0 percent. (*Id.*) The tank valve was then closed, and the forklift

continued running until the motor shut off, when the remaining fuel in the line was depleted. (*Id.*)

Next, the hose was removed from the tank and fumes could be heard escaping from the hose. (*Id.*)

The meter did not detect an increase in propane or a decrease in oxygen at any time. (*Id.* at 276-

77.) The process was performed again in reverse to reconnect the tank. (*Id.* at 277.) According to

Mr. Sasson, no gas is released during the reconnection procedure as the system is already empty

at that time. (*Id.*)

///

///

Based on Mr. Sasson's education, training, and experience, he opines that:

the forklift fuel tank exchange process does not pose a risk of serious harm, fire, or explosion as, based on my inspection and survey, the amount of gas generated during the procedure does not meet the criteria required to achieve a lower explosive limit. The fuel tank exchange procedure is safe, does not pose a hazard when performed correctly, and carries the same risk as performing a fuel tank exchange on a residential barbeque.

The C facility garment factory is also a very large well ventilated building, with several fans and swamp coolers, and the forklift fuel tank exchanges complained of occurred by the roll up door. The amount of ventilation where the tank exchanges occurred is equivalent to performing the exchange in an outdoor atmosphere. A 5 to 10 second release of fumes during the fuel exchange procedure, in this environment, poses negligible to no risk of fire or explosion, with no respiratory risk to the health and safety of the person(s) performing the tank exchange or the building occupants.

(Sasson Decl., ECF No. 70-4 at 277.)

Defendant Gilmore's Declaration

Defendant Gilmore provides an expert opinion on the risk of toxic exposure, asphyxiation, fire, or explosion from a leak during the forklift fuel exchange process at the SCC Sewing Factory. (Gilmore Decl., ECF No. 70-4 at 210-40.) Defendant Gilmore is the Fire Chief at SCC and worked as a fire fighter and fire engineer for approximately six years prior to joining CDCR. (*Id.* at 210-11.) The SCC station is an "all hazards fire department" and Defendant Gilmore is responsible for addressing all manner of emergencies, including all fires, hazmat incidents, and medical emergencies. (*Id.* at 211.)

Defendant Gilmore explains that the SCC Sewing Factory uses a forklift powered by an eight-gallon liquid propane gas (LPG) tank. (Gilmore Decl., ECF No. 70-4 at 211.) Propane is flammable but non-toxic and there is no risk of toxic exposure from propane. (*Id.*) However, propane is an asphyxiant and can present a health hazard if it displaces enough oxygen. (*Id.*) The SCC Sewing Factory is approximately 307,125 cubic feet with fourteen industrial oscillating ceiling fans, six swamp coolers, and seven exhaust fans. (*Id.*) Forklift fuel exchanges are performed in front of a large open roller door. (*Id.*)

According to Defendant Gilmore, although Plaintiff filed a grievance expressing concern that conditions created by overhead power strips or other work in the factory could ignite propane, propane is heavier than air and sinks to the ground when it is released. (Gilmore Decl., ECF No. 70-4 at 212.) Therefore, even if the building were sealed and the ventilation was turned

off, without a "significant" release of propane the risk of fire or explosion would be low because of the size of the building. (*Id.*) A five-to-ten second leak of LPG, as Plaintiff described in his grievance, would be quickly dispersed by the building's ventilation system, posing no risk of toxic exposure or any appreciable risk of asphyxiation, fire, or explosion. (*Id.*) This is because it would not be able to reach sufficient concentrations in the air to reach the lower explosive limit or displace enough oxygen to asphyxiate persons in the area. (*Id.*)

Plaintiff's Declaration

Plaintiff submits a declaration opining on the toxicity and flammability of propane and ethyl mercaptan. (Brown Decl., ECF No. 76 at 135-67.) Plaintiff served in the United States Army as a material handling and storage specialist and is familiar with forklift operations. (*Id.* at 136.) He later worked at Hewlett-Packard and joined the Emergency Response Team responsible for chemical spills/hazard cleanup. (*Id.*)

According to Plaintiff's declaration, the propane and ethyl mercaptan used in the shop is inextricable because it is joined at the atomic level. (Brown Decl., ECF No. 76 at 136.) Ethyl mercaptan is added to propane to give it a pungent, skunk odor and the smell of ethyl mercaptan means that propane is present. (*Id.*) Propane is a gas in its natural state and only becomes a liquid when condensed under extreme pressure within a solid metal container built to withstand the requisite pounds per square inch of pressure relative to the size of the container. (*Id.*) The propane/ethyl mercaptan compound mixture compressed inside a tank or cylinder "is at the ready to erupt or [expel] forth to its escape by any opening or breach within its container." (*Id.* at 137.)

Ethyl mercaptan is an extremely flammable liquid and vapor, is dangerous and hazardous, and is harmful if swallowed or inhaled. (Brown Decl., ECF No. 76 at 137.) It should be kept away from heat, sparks, open flames, and hot surfaces; one should not eat, drink, or smoke, when using this product; and it should be used only outdoors or in a well-ventilated area. (*Id.*) A container of ethyl mercaptan should be kept tightly closed and protective gear should be used when handling it. (*Id.*) Ethyl mercaptan is very toxic. (*Id.*)

The ethyl mercaptan/propane compound is extremely flammable. (Brown Decl., ECF No. 76 at 137.) The container is under pressure and in a fire or if heated may burst and create an explosion. (*Id.*) The vapor/gas is heavier than air and will spread along the ground. (*Id.*) It can

12

travel a considerable distance to a source of ignition and flash back, causing fire or explosion. (*Id.*) A spark or static discharge is all that's needed to supply a source of ignition. (*Id.*) Plaintiff attaches safety data sheets for ethyl mercaptan and propane to his declaration. (*Id.* at Exhs. A-B.)

Plaintiff further declares that the August 8, 2018 incident in the SCC Sewing Factory was an expulsion of the chemical compound propane/ethyl mercaptan unabated for approximately ten seconds. (Brown Decl., ECF No. 76 at 138.) Either Defendant Chothia or inmate Davis purposely opened the valve of the cylinder before the hose was properly connected. (*Id.*)

### 2. Analysis

Having considered the declarations submitted by the parties, and construing all evidence in Plaintiff's favor, no reasonable juror could find based on the undisputed evidence that the propane tank leaks at the SCC Sewing Factory created a substantial risk of serious harm to Plaintiff or any other individual present. Therefore, Defendants Shaw, Crutchfield, Walker, Allen, Kempe, Chothia, Artis, Jukes, and Gilmore are entitled to summary judgment on Plaintiff's Eighth Amendment claims against them.

*Helling v. McKinney* addressed the framework for Eighth Amendment claims arising from involuntary exposure to environmental hazards. In *Helling,* the plaintiff alleged that he was housed with a cellmate that smoked up to five packages of cigarettes per day exposing the plaintiff to environmental tobacco smoke ("ETS") that posed a risk to his health. *Helling,* 509 U.S. at 27. The Supreme Court held that Eighth Amendment claims for unconstitutional prison conditions require the prisoner to prove both an objective and subjective factor. *Id.* at 35. The *Helling* court reasoned:

> with respect to the objective factor, determining whether McKinney's conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Id.* at 36.

Here, Defendants have met their burden of producing evidence negating an essential element of Plaintiff's Eighth Amendment claims, *i.e.* that a ten second release of fumes in the SCC Sewing Factory creates a substantial risk of serious harm to the building's occupants. Dr. Durrani opines that, even if the entire eight-gallon tank of propane and ethyl mercaptan were emptied into the SCC Sewing Factory and it was completely sealed, the propane levels would not exceed the levels considered to be immediately dangerous to life or health. (Durrani Decl., ECF No. 70-4 at 268.) A ten second leak would be dispersed by the building's ventilation system, "eliminating the possibility of oxygen displacement or any toxicity." (*Id.*) Mr. Sasson, in turn, opines that a five-to-ten second release of fumes in the SCC Sewing Factory "poses negligible to no risk of fire or explosion, with no respiratory risk to the health and safety of the person(s) performing the tank exchange or the building occupants." (Sasson Decl., ECF No. 70-4 at 277.) Defendant Gilmore likewise opines that a five-to-ten second leak of fumes would be quickly dispersed by the SCC Sewing Factory's ventilation system, posing no risk of toxic exposure or any appreciable risk of asphyxiation, fire, or explosion. (Gilmore Decl., ECF No. 70-4 at 212.) Viewing this evidence in the light most favorable to Plaintiff, Defendants have made a sufficient showing that, in light of the size and ventilation in the SCC Sewing Factory, a ten second leak of fumes from the forklift propane tanks does not create substantial risk of toxic exposure, fire, or explosion.

Plaintiff attempts to dispute Defendants' expert declarations on various grounds. (*See* ECF No. 76 at 175-77, 186-90.) As to Dr. Durrani's opinion, Plaintiff argues that Dr. Durrani's "theory is not [representative] in any way of real events in SCC Sew Factory on August 8, 2018" because "Plaintiff's complaint concerns the release of gas from a gas cylinder improperly threaded or connected to the hose." (ECF No. 76 at 186.) However, Dr. Durrani did not premise his opinion on any of the factors Plaintiff identifies. There is no indication that the source of the leak or method of exposure has any bearing on the toxicity of propane and ethyl mercaptan.

Plaintiff also argues that Dr. Durrani was not an eyewitness to the events at issue in this case and does not know what pounds per square inch of pressure was applied to the gas cylinder so he has no way of determining the level to which Plaintiff was exposed. (ECF No. 76 at 187.) An expert may render an opinion that is not based on their personal knowledge of the facts. *See,*

*e.g., General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (explaining "[t]rained experts commonly extrapolate from existing data"); *Daubert,* 509 U.S. at 591 ("[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation"). Further, Dr. Durrani identifies the size of the tank as eight gallons and notes the level of ethyl mercaptan in odorized propane, which is .5 ppm, as well as the length of exposure, which Plaintiff reported lasting ten seconds. (*See* Durrani Decl., ECF No. 70-4 at 268.) Dr. Durrani also acknowledges that the propane at issue is in liquid form which, as Plaintiff explains in his declaration, means that the contents are under extreme pressure. (*See id.*; *see also* Brown Decl., ECF No. 76 at 136.) Therefore, Dr. Durrani had a reasonable basis for his opinions.

Next, Plaintiff argues that Mr. Sasson's opinion is based on "something different from Plaintiff's claim" because Plaintiff's complaint concerns a release of gas from a pressurized tank on August 8, 2018, while the release valve was open and the hose was improperly threaded or connected. (ECF No. 76 at 188.) Plaintiff also objects that he was not present when Mr. Sasson conducted his site inspection and it was conducted two years after the incident at issue. (*Id.*) However, Plaintiff only concludes that Mr. Sasson's site inspection and testing is "different" from his claims and does not explain how Mr. Sasson's methodology was deficient. Further, there is no requirement that Plaintiff be present during the site inspection. Plaintiff does not explain how the passage of time after the August 8, 2018 incident or any of the other factors he identifies undermine Mr. Sasson's opinions.

Additionally, Plaintiff objects to Mr. Sasson's opinion because the shop has ignition sources and "[t]he ventilation is not explosion proof, nor is the exhaust and lighting." (ECF No. 76 at 188.) Fires can occur outside, and one spark from PG&E powerlines burned the entire town of Paradise, California, therefore "size is not a factor for fire. A flammable gas plus ignition source is all that's needed." (*Id.* at 190.) Plaintiff cites to Section 5 of the Safety Data Sheet for ethyl mercaptan and his deposition testimony in support of his argument that the size and ventilation in the SCC Sewing Factory do not reduce the risk of fire or explosion. (*Id.*) Specifically, Section 5 of the Safety Data Sheet for ethyl mercaptan sets forth information related to firefighting measures, such as the flash point, autoignition temperature, suitable extinguishing media, and special equipment firefighters should use, among other things, but does not address

whether the size and ventilation of a building reduce the risk of fire or explosion. (*Id.* at 143.)[5] Plaintiff's deposition testimony, in turn, merely restates Plaintiff's argument that it only takes a spark to have a fire and one spark burned the entire city of Paradise, California. (*Id.* at 44.) These documents do not establish that the size and ventilation of a building have no bearing on the risk of fire or explosion from a leak of liquid propane as Plaintiff contends.

Plaintiff also objects to Mr. Sasson's opinion because he did not know the amount of pressure the gas was under. (ECF No. 76 at 190.) However, Mr. Sasson performed a site visit and inspection of the SCC Sewing Factory and measured the forklift propane tank with an LEL meter during his testing. (Sasson Decl., ECF No. 70-4 at 276.) Mr. Sasson also observed the size and conditions of the SCC Sewing Factory during his visit. (*Id.*) Therefore, Mr. Sasson had a sufficient basis to form an opinion about the risk of fire or explosion from a five-to-ten second release of liquid propane in to the SCC Sewing Factory.

Finally, Plaintiff argues that Defendant Gilmore's opinion is inaccurate because Plaintiff's claim "is of toxic, flammable fumes being released in a shop with Plaintiff and 120 inmate employees present." (ECF No. 76 at 176-77.) Plaintiff does not explain how, if at all, this characterization of his claims undermines or otherwise affects Defendant Gilmore's opinion. (*See id.*) Plaintiff also again objects to Defendant Gilmore's observations regarding the size and ventilation in the SCC Sewing Factory because the building also has ignition sources. (*Id.* at 176) However, Defendant Gilmore expressly took these ignition sources into consideration when forming his opinion. (*See* Gilmore Decl., ECF No. 70-4 at 211.) Plaintiff further argues that "size has no effect on fire" and an ignition source is all that's needed, citing to his deposition testimony and the Safety Data Sheet for propane attached to his declaration. (ECF No. 76 at 176-77.) As above, these documents do not establish that the size and ventilation of the SCC Sewing Factory are irrelevant to the risk of fire or explosion.

Defendants have met their burden of production on summary judgment and the burden therefore shifts to Plaintiff to set forth specific facts showing that there is a genuine issue for trial.

---

[5] Notably, when describing the best practices for handling ethyl mercaptan, Plaintiff's declaration states that ethyl mercaptan "should be used only outdoors or in a well-ventilated area." (ECF No. 76 at 137.) Therefore, Plaintiff's declaration acknowledges that the size and ventilation of a building is a relevant safety consideration when using ethyl mercaptan.

Plaintiff must present evidence from which a reasonable jury could conclude, without engaging in speculation, that a ten second release of propane and ethyl mercaptan in the SCC Sewing Factory would create a substantial risk of toxic exposure, fire, or explosion. Plaintiff has not met that burden. Plaintiff's declaration[6] presents evidence of best practices and procedures to follow when handling ethyl mercaptan and propane, such as:

> [e]thyl mercaptan . . . should be kept away from heat/sparks/open flames/hot surfaces. One should not eat, drink or smoke when using this product. It should be used only outdoors or in a well-ventilated area. Container should be kept tightly closed. One should avoid breathing dust/fume/gas/mist vapors/spray. When using or handling one should wear protective gloves/eye protection/face protection. And use only non-sparking tools, use explosion-proof electrical/ventilating/lighting equipment.

(ECF No. 76 at 137.) However, Plaintiff's declaration does not establish that the risks from a ten second leak of these chemicals in the SCC Sewing Factory are "so grave that it violates contemporary standards of decency[.]" *Helling,* 509 U.S. at 27; *see also Anderson,* 477 U.S. at 259-60 (reasoning that, while the evidence of the nonmoving party is "to be believed, and all justifiable inferences are to be drawn in its favor," if the nonmoving party's evidence is merely colorable or is not significantly probative, summary judgment may be granted"). Although Plaintiff's evidence may be sufficient to establish that best practices were not followed resulting in a release of fumes and sulfuric odor on August 8, 2018, when construing the evidence in Plaintiff's favor, there is no genuine dispute that the propane tank leaks at issue in this case did not create a substantial risk of serious harm as required for a deliberate indifference claim under the cruel and unusual punishment clause of the Eighth Amendment.

Because Plaintiff has not submitted evidence from which a reasonable jury could find that a ten second leak of fumes from the forklift propane tanks in to the SCC Sewing Factory creates a serious risk of toxic exposure, fire, or explosion, the Court recommends granting summary judgment in favor of Defendants Shaw, Crutchfield, Walker, Allen, Kempe, Chothia, Artis, Jukes,

---

[6] On reply, Defendants argue that Plaintiff is not qualified to offer an opinion regarding the risk of toxic exposure, fire, or explosion from propane and ethyl mercaptan. (ECF No. 80 at 2-4.) Plaintiff's description of his work experience indicates that he has some knowledge and background regarding propane and ethyl mercaptan. (*See* ECF No. 76 at 136.) Nonetheless, even assuming Plaintiff is qualified to provide an opinion on these issues, his declaration fails to raise a genuine dispute of fact as discussed herein.

1    and Gilmore on Plaintiff's Eighth Amendment claims.[7]

2            b.  First Amendment Claims

3                i.  First Amendment Legal Standards

4        Prisoners have a First Amendment right to file prison grievances and retaliation against

5    prisoners for exercising this right is a constitutional violation. *Rhodes v. Robinson,* 408 F.3d 559,

6    566 (9th Cir. 2005); *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003). A claim for First

7    Amendment retaliation in the prison context requires: (1) that a state actor took some adverse

8    action against the plaintiff (2) because of (3) the plaintiff's protected conduct, and that such

9    action (4) chilled the plaintiff's exercise of his First Amendment rights, and (5) "the action did

10   not reasonably advance a legitimate correctional goal." *Rhodes,* 408 F.3d at 567-68; *Brodheim v.*

11   *Cry,* 584 F.3d 1262, 1269 (9th Cir. 2009).

12       To prove the second element, retaliatory motive, plaintiff must show that his protected

13   activities were a "substantial" or "motivating" factor behind the defendant's challenged

14   conduct. *Brodheim v. Cry*, 584 F.3d 1262, 1269, 1271 (9th Cir. 2009). Plaintiff must provide

15   direct or circumstantial evidence of defendant's alleged retaliatory motive; mere speculation is

16   not sufficient. *See McCollum v. CDCR*, 647 F.3d 870, 882–83 (9th Cir. 2011); *accord*, *Wood v.*

17   *Yordy*, 753 F.3d 899, 905 (9th Cir. 2014). In addition to demonstrating defendant's knowledge of

18   plaintiff's protected conduct, circumstantial evidence of motive may include: (1) proximity in

19   time between the protected conduct and the alleged retaliation; (2) defendant's expressed

20   opposition to the protected conduct; and (3) other evidence showing that defendant's reasons for

21   the challenged action were false or pretextual. *McCollum*, 647 F.3d at 882.

22               ii.  Defendants Jukes and Londono

23       Defendants Jukes and Londono move for summary judgment on Plaintiff's First

24   Amendment claims against them. (ECF No. 70-2 at 27.)

25       It is undisputed that Plaintiff submitted a lay-in slip on August 16, 2018, which stated

26   "Injured at Work: Yes." (UMF 136, ECF Nos. 70-3 at 23, 76 at 191, 80-5 at 51.) Defendant filed

27   a 602 grievance concerning the August 8, 2018 incident on August 18, 2018. (ECF No. 76 at 14,

---

[7] Given the Court's recommendation, the Court declines to address the remainder of Defendants' arguments regarding Plaintiff's Eighth Amendment claims, including whether Defendants were subjectively deliberate indifferent or entitled to qualified immunity. (*See* ECF No. 70-2 at 24-26, 29.)

ECF No. 80-4 at 3.) On September 27, 2018, Defendant Jukes wrote a document titled Rules Violation Report, which was marked as "Counseling Only" under the "Classification" section. (UMF 140-41, ECF Nos. 70-3 at 24, 76 at 189, 80-5 at 52-53; Jukes Decl., ECF No. 70-4 at 208.) The RVR stated that, on September 25, 2018, Plaintiff was being interviewed by Defendants Crutchfield and Jukes in response to his 602 grievance and informed them of a workplace injury on August 8, 2018, which had not been previously reported. (Jukes Decl., ECF No. 70-4 at 208.) Defendant Londono was identified as the reviewing supervisor. (*Id.*)

Defendants argue that Defendant Jukes did not author an RVR against Plaintiff and the document was a non-disciplinary counseling chrono. (ECF NO. 70-2 at 27.) Further, this document was not written in response to the 602 grievance but because Plaintiff failed to report the August 8, 2018 incident immediately in violation of the SCC Sewing Factory's code of safe practices. (*Id.*) Defendant Londono approved the chrono based on his understanding that Plaintiff had in fact failed to report any injury on August 8, 2018. (*Id.*)

Plaintiff contends that he did not receive a counseling chrono because counseling chronos are initially verbal and the document states that it is an RVR. (ECF No. 76 at 189.) Plaintiff argues that he verbally informed Defendant Jukes of the August 8, 2018 incident on August 23, 2018, and gave Defendant Jukes a lay-in on August 16, 2018, stating that Plaintiff was injured at work. (*Id.* at 190-91; ECF No. 1 at 6.) If Defendant Jukes intended to issue a counseling chrono he would have done so on either August 16, 2018, or August 23, 2018, rather than waiting until Plaintiff's 602 hearing on September 25, 2018. (*Id.* at 20, 191.)

On reply, Defendants argue that counseling chronos are not required to be verbal and may be documented in writing. (ECF No. 80 at 6-7.) Defendants also contend that Defendant Jukes did not notice that the lay-in slip identified a work injury. (*Id.* at 7.) Further, Defendants dispute that Plaintiff verbally informed Defendant Jukes of the incident on August 23, 2018. (*Id.*)

Construing the evidence in the light most favorable to Plaintiff, the Court finds that Defendants Jukes and Londono are not entitled to summary judgment on Plaintiff's First Amendment retaliation claim. As an initial matter, the parties dispute whether the document Defendant Jukes authored and Defendant Londono approved was an RVR or a counseling chrono.

However, regardless of the appropriate classification, Defendants do not adequately address whether counseling chronos constitute adverse action for purposes of retaliation. Although Defendants contend that the RVR/counseling chrono did not result in "formal" discipline, Defendants do not provide any authority for the proposition that only formal discipline may constitute an adverse action. (*See* ECF No. 70-3 at 26) *See Brodheim,* 584 F.3d at 1270 ("[T]he mere *threat* of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect.") (Emphasis in original). Plaintiff submits his deposition testimony stating his understanding that any rules violation report, negative or otherwise, can adversely affect his chances of parole. (ECF No. 76 at 40.) Further, as Defendants acknowledge on reply, counseling chronos are issued in response to "minor misconduct." (ECF No. 80-4 at 8.) A reasonable jury could find that the RVR/counseling chrono at issue intimated that some form of punishment or negative effect would follow if Plaintiff did not correct the underlying "misconduct." *See Brodheim,* 584 F.3d at 1270. ("By its very nature, a statement that 'warns' a person to stop doing something carries the implication of some consequence of a failure to heed that warning."). Therefore, Defendants have not met their initial burden of demonstrating that there is no genuine dispute of fact as to whether the RVR/counseling chrono constituted an adverse action.

Defendants also argue that the RVR/counseling chrono was written in response to Plaintiff's failure to report the August 8, 2018 incident pursuant to SCC Sewing Factory safety policies and not in response to Plaintiff's 602 grievance. However, it is undisputed that Defendant Jukes did not issue the RVR/counseling chrono until September 27, 2018, two days after Plaintiff's 602 grievance hearing. A reasonable jury could find that the proximity between the counseling chrono and the grievance hearing creates an inference that the reason for issuing the RVR/counseling chrono was pretextual. Further, the parties have submitted conflicting evidence as to whether Defendant Jukes was also aware that Plaintiff was injured during the August 8, 2018 incident several weeks prior to the 602 grievance hearing. Construing the evidence in the light most favorable to Plaintiff, Defendants have failed to meet their initial burden of showing that there is no genuine dispute as to whether the RVR/counseling chrono was issued because of

Plaintiff's 602 grievance.

Finally, on reply, Defendants argue that the RVR/counseling chrono was reasonably related to a legitimate penological interest: Plaintiff's failure to report his injury on the date of the incident. (ECF No. 80 at 8.) However, the Ninth Circuit has cautioned that "prison officials may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right." *Bruce,* 351 F.3d at 1289. Here, because there is a genuine issue of fact as to retaliatory motive, Defendants cannot rely on the prison's general penological interests to succeed on their motion for summary judgment.

For these reasons, the Court recommends that Defendants Jukes and Londono's motion for summary judgment on Plaintiff's First Amendment retaliation claims be denied.

### iii. *Defendant Crutchfield*

Defendant Crutchfield moves for summary judgment on Plaintiff's First Amendment claim against her. (ECF No. 70 at 27.)

It is undisputed that, on September 25, 2018, Defendant Crutchfield conducted an appeal interview on Plaintiff's 602 grievance. (*See* UMF No. 95, ECF Nos. 70-3 at 6, 76 at 183, 80-5 at 35.) According to Defendant Crutchfield, she does not recall raising her voice during her interview with Plaintiff and, while she may have interrupted Plaintiff, she does not believe she was condescending or intimidating during their discussion. (Crutchfield Decl., ECF No. 70-4 at 29.) Defendant Crutchfield states that Plaintiff said something to the effect of "maybe I should get another job" and she told him that she would be willing to sign a job change request slip if that's what Plaintiff wanted to do. (*Id.*) Defendant Crutchfield did not intend her statements to Plaintiff to be a threat and she was not threatening to fire Plaintiff, although she has no control over how Plaintiff subjectively perceives her or chooses to interpret her words and actions. (*Id.*)

Plaintiff disputes Defendant Crutchfield's characterization of their conversation during the September 25, 2018 interview. Plaintiff submits deposition testimony in which he testified that Defendant Crutchfield slid her chair up really close to Plaintiff and told him he wasn't safe, he

was in danger, and she could help him work somewhere else, or he could work somewhere else.[8] (ECF No. 76 at 39.) Plaintiff argues that Defendant Crutchfield did intimidate and threaten to fire him and he denies saying "maybe I should get another job" during the interview. (*Id.*)

On reply, Defendants concede that the parties dispute whether Defendant Crutchfield threaten to fire Plaintiff, but argue that Plaintiff failed to present any admissible evidence that the alleged threat was in response to Plaintiff's 602 grievance as opposed to the failure to report his injury on August 8, 2018. (ECF No. 80 at 8-9.)

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that there is a genuine dispute of fact precluding summary judgment. As Defendants acknowledge, the parties dispute whether Defendant Crutchfield threatened to fire Plaintiff, which can constitute an adverse action for purposes of a retaliation claim. *See Brodheim,* 584 F.3d at 1270. Further, a reasonable jury could find that the fact that Defendant Crutchfield's threat was made during the 602 grievance hearing creates an inference that the threat was in retaliation for Plaintiff's 602 grievance. Defendant Crutchfield has not met her burden of establishing that there is no genuine dispute of fact as to whether she retaliated against Plaintiff for filing a 602 grievance.

Therefore, the Court recommends that Defendant Crutchfield's motion for summary judgment on Plaintiff's First Amendment claim be denied.

### c. Qualified Immunity

#### i. Legal Standards

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "The protection of qualified immunity

---

[8] Plaintiff's response to Defendants' statement of undisputed facts also cites to other portions of his deposition. (ECF No. 76 at 192.) However, some of the pages Plaintiff cites were not submitted to the Court. (*See id.* at 34-50.)

applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567, (2004) (Kennedy, J., dissenting)).

In determining whether an officer is entitled to qualified immunity, the Court must decide (1) whether facts alleged or shown by plaintiff make out a violation of constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct. *Pearson,* 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In resolving these issues, the Court must view the evidence in the light most favorable to the plaintiff and resolve all material factual disputes in favor of the plaintiff. *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003).

> *ii. Analysis*

Defendants Jukes, Londono, and Crutchfield argue that they are entitled to qualified immunity "because no reasonable person in their respective positions would believe that they could be held liable for retaliation when they did not take any adverse action against Plaintiff because of the grievance he filed[.]" (ECF No. 70 at 29.) Further, the law was not clearly established that an employee could be held liable under these circumstances. (*Id.*) Plaintiff, in turn, argues that Defendants Jukes, Londono, and Crutchfield are not entitled to qualified immunity because they violated his First Amendment rights and a prisoner's constitutional right of meaningful access to the courts is fundamental. (ECF No. 76 at 21.)

As discussed above, there is a dispute of fact as to whether Defendants Jukes, Londono, and Crutchfield took adverse action against Plaintiff because of his 602 grievance. Further, it was clearly established when Plaintiff filed his grievance in 2018 that he had the constitutional right to do so, and that right did not "hinge on the label" the prison placed on his complaints. *See Turner,* 482 U.S. at 84; *Brodheim* 584 F.3d at 1271 n.4. It would have been clear to Defendants Jukes, Londono, and Crutchfield that retaliating against Plaintiff for filing a grievance would violate the law. Therefore, the Court finds that Defendants Jukes, Londono, and Crutchfield are not entitled to qualified immunity on Plaintiff's First Amendment claims.

///

///

23

## VI. CONCLUSION AND RECOMMENDATIONS

Accordingly, for the reasons discussed above, IT IS HEREBY RECOMMENDED[9] that:

1. Defendants' motion for summary judgment (ECF No. 70) be granted in part and denied in part;

2. Summary judgment be granted in favor of Defendants Shaw, Crutchfield, Walker, Allen, Kempe, Chothia, Artis, Jukes, and Gilmore on Plaintiff's Eighth Amendment claim for deliberate indifference to serious risk of harm;

3. Summary judgment be denied as to Plaintiff's First Amendment retaliation claims against Defendants Jukes, Londono, and Crutchfield.

These findings and recommendations are submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within twenty-one (21) days after being served with these findings and recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __July 12, 2021__          _____/s/ Erica P. Grosjean_____
                                 UNITED STATES MAGISTRATE JUDGE

---

[9] Federal Rule of Civil Procedure 54(b) provides that "[w]hen an action presents more than one claim for relief ... or multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court determines that there is no just reason for delay." This determination "left to the sound judicial discretion of the district court" but such discretion should be exercised "in the interest of sound judicial administration" and in light of the "historic federal policy against piecemeal appeals." *Id.* In determining whether to direct entry of a final judgment as to fewer than all parties, courts should consider "whether the certified order is sufficiently divisible from the other claims such that the case would not inevitably come back to this court on the same set of facts." *Jewel v. Nat'l Sec. Agency*, 810 F.3d 622, 628 (9th Cir. 2015) (internal citations omitted). Here, Defendants do not request entry of a separate final judgment. Additionally, a final judgment would not be divisible from the other claims in the case, would lead to piecemeal judgments, and any appeal of a later judgment would involve the same set of facts. Therefore, the Court does not recommend entry of a separate final judgment at this time.